UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| RICKY STARRETT, <br><br> Plaintiff, <br><br> v. <br><br> COMMISSIONER OF SOCIAL SECURITY, <br><br> Defendant. | Case No. 1:23-CV-524 JD |

**OPINION AND ORDER**

Plaintiff Ricky Starrett appeals the denial of his claims for disability insurance benefits under Title II of the Social Security Act. For the reasons below, the Court will affirm the Commissioner's decision.

**A. Background**

In February 2022, Mr. Starrett applied to the Social Security Administration for disability benefits, alleging that he became disabled in June 2021. Mr. Starrett's claims were rejected, leading to a review by an Administrative Law Judge ("ALJ").

In the proceedings before the ALJ, Mr. Starrett maintained that he had breathing and cardiac issues, as well as anxiety in social situations. Mr. Starrett sought medical attention multiple times in 2021 and 2022 primarily for conditions related to his heart and pulmonary function. He experienced chest discomfort, fatigue, and weakness, which led to hospital visits and follow-ups with cardiologists. Mr. Starrett had a history of heart problems, including the implantation of a pacemaker and coronary artery intervention. He also underwent pulmonary

function testing in July 2021, which showed severe obstructive disease. At that time, he was 73 inches tall[1] and weighed 157 pounds.

Mr. Starrett was hospitalized on September 30 through October 2, 2022, after developing chest pain and shortness of breath. (R. at 1664.) He was found to have acute chronic systolic and diastolic heart failure due to ischemic cardiomyopathy, non-ST elevation myocardial infarction, and coronary artery disease. Dr. Michael Cheezum's review of the records on October 31, 2022, showed that during the hospitalization Mr. Starrett's left anterior stenosis was completely resolved after intervention, and an echocardiogram on the same date showed moderately decreased left ventricular systolic function with ejection fraction of 37% as compared to 65% two and a half years earlier. He participated in cardiac rehabilitation, showing some improvement.

At the hearing, Mr. Starrett testified that he could not work mainly because of breathing difficulties and anxiety around people. He uses a rescue inhaler and a nebulizer for his breathing issues. He said that, despite having a pacemaker and participating in cardiac rehab, he often experiences atrial fibrillation and ongoing chest pain and shortness of breath. According to Mr. Starrett, he can walk about a block before needing to rest, cannot use stairs due to cardiopulmonary symptoms, and can only stand for about 15 minutes before lower back pain and breathing issues force him to sit. He estimated he could lift and carry around 5 to 10 pounds.

The ALJ issued a decision finding that Mr. Starrett was not disabled before May 13, 2023.[2] (R. at 26.) In doing so, the ALJ employed the customary five-step analysis. At Step 2, the

---

[1] In his briefs, Mr. Starrett states that he is "at least 72 inches tall." (Pl.'s Br., DE 16 at 9; see also R. at 84 (medical record noting his "Self Reported Height: 72 inches").) While the Court defers to the ALJ's finding that he was 73 inches tall, whether Mr. Starrett is "at least 72 inches" or 73 inches tall is inconsequential for this decision.

[2] As of May 13, 2023, Plaintiff changed age categories to an "individual of advanced age" under the Commissioner's regulations (R. at 25.) The ALJ determined that beginning on that date, a finding of "disabled" was

ALJ determined that Mr. Starrett suffered from the following severe impairments: "heart failure with ischemic cardiomyopathy; atrial fibrillation; coronary artery disease; chronic obstructive pulmonary disease; cervical degenerative disc disease; liver disease; anxiety; depression; attention deficit hyperactivity disorder; social anxiety; and posttraumatic stress disorder." (R. at 13.)

At Step 3, the ALJ found that Mr. Starrett did not have an impairment, or combination of impairments, that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. As related to this appeal, the ALJ found in particular that Mr. Starrett's impairments did not qualify for Listing 3.02 (chronic respiratory disorders due to any cause except cystic fibrosis) or Listing 4.02 (chronic heart failure while on a regimen of prescribed treatment).

At Step 4, the ALJ determined Mr. Starrett's residual functional capacity ("RFC"),[3] finding that he can

> perform light work as defined in 20 CFR 404.1567(b)[4] except he should never climb ladders, ropes, or scaffolds. He can occasionally climb ramps and stairs, occasionally balance as defined in the SCO of the DOT, and occasionally stoop, kneel, crouch, and crawl. He must avoid concentrated exposure to extreme cold, extreme heat, humidity, hazards such as unprotected heights and moving mechanical parts, and to fumes, odors, dust, gases, and other pulmonary irritants as defined in the Selected Characteristics of Occupations of the DOT. He can

---

appropriate through direct application of Medical-Vocational Rule 202.06 (R. at 27). Thus, the sole issue in this case is whether substantial evidence supports the ALJ's decision that Plaintiff was not disabled before May 13, 2023.

[3] "The RFC reflects 'the most [a person] can still do despite [the] limitations' caused by medically determinable impairments and is assessed 'based on all the relevant evidence in [the] case record.'" *Cervantes v. Kijakazi*, No. 20-3334, 2021 WL 6101361, at *2 (7th Cir. Dec. 21, 2021) (quoting 20 C.F.R. §§ 404.1545, 416.945(a)).

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567.

3

> understand, remember, and carry out simple instructions. He is able to use judgment to make simple work-related decisions. He cannot perform work requiring a specific production rate such as assembly line work or work that requires hourly quotas. He can have frequent interactions with supervisors and coworkers and occasional interactions with the public.

(R. at 18.)

In fashioning the RFC, the ALJ reviewed, among other things, an FMLA form filled out by Dr. Lawrence Gering, a cardiologist whom Mr. Starrett saw in August 2021. Dr. Gering noted that Mr. Starrett was seeking FMLA based on coronary artery disease and supraventricular tachycardia. (R. at 340.) He opined that "flare ups causing leg pain, chest pain, or palpitations could interfere with Plaintiff's ability to perform one or more job functions." (R. at 339.) He estimated that Mr. Starrett would be incapacitated one to two times per month, for about one to three days per episode. (R. at 340.) Dr. Gering stated that Mr. Starrett required only yearly office visits for his cardiac condition (R. at 340).

The ALJ found Dr. Gering's opinion unpersuasive:

> The opinion of Dr. Gering is not persuasive because this is not a durational assessment, not supported by explanation provided, and not supported by the overall record hearing. The claimant was stable from a cardiac standpoint and generally denied any cardiac symptoms until September 2022 when he underwent stent, and then continued to have stabilization thereafter. Further, the explanation provided by Dr. Gering does not support the limitations identified and the records noting stabilization are also inconsistent with this report.

(R. at 24.)

In light of the RFC, the ALJ determined that Mr. Starrett is unable to perform any past relevant work. (R. at 25.) At the final step, the ALJ found that, considering Mr. Starrett's age, education, work experience, and the RFC, there were jobs in significant numbers in the national economy that he can perform (mail clerk, garment sorter, collator operator). (R. at 26.) The ALJ arrived at this conclusion after questioning a Vocational Expert at the hearing.

4

After the Appeals Council denied Mr. Starrett's request for review of the ALJ's decision, he appealed to this Court.

**B.    Standard of Review**

Because the Appeals Council denied review, the Court evaluates the ALJ's decision as the final word of the Commissioner of Social Security. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). This Court will affirm the Commissioner's findings of fact and denial of benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "The threshold for substantial evidence 'is not high.'" *Warnell v. O'Malley*, 97 F.4th 1050, 1052 (7th Cir. 2024) (quoting *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019)). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

The ALJ has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399–400. In evaluating the ALJ's decision, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision. *Id.* An ALJ must evaluate both the evidence favoring the

claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his or his findings. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). The ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

**C. Standard for Disability**

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step process to determine whether the claimant qualifies as disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)–(v); 416.920(a)(4)(i)–(v). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;
2. Whether the claimant has a medically severe impairment;
3. Whether the claimant's impairment meets or equals one listed in the regulations;
4. Whether the claimant can still perform past relevant work; and
5. Whether the claimant can perform other work in the national economy.

*See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

At step two, an impairment is severe if it significantly limits a claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1522(a), 416.922(a). At step three, a claimant is deemed disabled if the ALJ determines that the claimant's impairment or combination of impairments

meets or equals an impairment listed in the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If not, the ALJ must then assess the claimant's residual functional capacity, which is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. §§ 404.1545, 416.945. The ALJ uses the residual functional capacity to determine whether the claimant can perform his or his past work under step four and whether the claimant can perform other work in society at step five. 20 C.F.R. §§404.1520(e), 416.920(e). A claimant qualifies as disabled if he or he cannot perform such work. The claimant has the initial burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that there are a significant number of jobs in the national economy that the claimant can perform. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

**D. Discussion**

In his appeal, Mr. Starrett raises two contentions: First, he argues that the ALJ erred when he found that Listings 3.02 and 4.02 weren't met. Second, he insists that the ALJ failed to adequately evaluate Dr. Gering's opinion. Neither argument has merit.

**(1)** *Listings 3.02 and 4.02*

The Listings describe impairments so severe they are presumptively disabling:

> At step three, the ALJ must determine whether the claimant's impairments are "severe enough" to be presumptively disabling—that is, so severe that they prevent a person from doing any gainful activity and make further inquiry into whether the person can work unnecessary. 20 C.F.R. § 404.1525(a); *see Sullivan v. Zebley*, 493 U.S. 521, 532-33, 110 S. Ct. 885, 107 L. Ed. 2d 967 (1990). An impairment is presumptively disabling if it is listed in the relevant regulations' appendix, *see* 20 C.F.R. § 404.1525(a), or if it is "medically equivalent" to a listing, *id*. § 404.1526(a). A medically-equivalent impairment has characteristics "at least of

7

equal medical significance" to all the specified criteria in a listing. *Id*. § 404.1526(b); *cf*. *Zebley*, 493 U.S. at 530. When evaluating whether an impairment is presumptively disabling under a listing, the ALJ "must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004).[5]

*Jeske v. Saul*, 955 F.3d 583, 588 (7th Cir. 2020).

Because a claimant will be found disabled if his impairment meets or equals an impairment found in the Listings, "the criteria for meeting a Listing are interpreted strictly." *Wilder v. Kijakazi*, 22 F.4th 644, 651 (7th Cir. 2022) (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify."). "To match a listed impairment, the claimant bears the burden of showing that his impairment meets 'all of the specified medical criteria.'" *Victoria R. v. Kijakazi*, No. 20-CV-4444, 2022 U.S. Dist. LEXIS 148045, at *23 (N.D. Ill. Aug. 18, 2022) (quoting *Sullivan*, 493 U.S. at 530). "While a claimant need not produce evidence showing that each symptom was present at precisely the same time, she must present medical findings sufficient to establish that all of the listing's criteria were, or could be expected to be, present together over a continuous twelve-month period." *Dzafic v. Kijakazi*, No. 22-2090, 2023 U.S. App. LEXIS 6292, at *11 (7th

---

[5] The Court notes that the interpretation of what constitutes "more than a perfunctory analysis of the listing" has changed since the 2017 Social Security Ruling 17-2p, 2017 WL 3928306, at *4.

> [I]n the past the Seventh Circuit has found a conclusory and inadequate consideration of the Listings to be a basis for remand. Speaking of an ALJs two-sentence dismissal of a Listing, the court said: "This is the very type of perfunctory analysis we have repeatedly found inadequate to dismiss an impairment as not meeting or equaling a Listing." [*Minnick v. Colvin*, 775 F.3d 929, at 935–36 (7th Cir. 2015)], citing *Kastner v. Astrue*, 697 F.3d 642, 647-48 (7th Cir. 2012); *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004); *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003). . . . But the regulatory framework has changed since the cases on which Taylor relies. As of March 27, 2017, the applicable Social Security Ruling expressly provides that the ALJ need not be more detailed in articulating her finding of non-equivalence.

*Taylor v. Kijakazi*, No. 1:20CV88-PPS, 2021 U.S. Dist. LEXIS 175339, at *4-5 (N.D. Ind. Sep. 15, 2021); *see also Dzafic*, No. 22-2090, 2023 WL 2536340, at *3 (7th Cir. Mar. 16, 2023) (finding that the ALJ offered more than perfunctory analysis when he stated that the listing was not met given the absence of evidence relevant to each subcategory of the listing).

8

Cir. Mar. 16, 2023) ."An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530.

Listing 3.02 applies to "chronic respiratory disorders due to any cause except [cystic fibrosis]." 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing 3.02). To meet this Listing, a person who is 73 inches tall must have an $FEV_1$ value less than or equal to 1.90. The $FEV_1$ value is determined through a spirometry test, which measures how well the individual moves air into and out of their lungs. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00(E)(1). The volume of air exhaled in the first second of the forced expiratory maneuver is the $FEV_1$ value, and the agency uses the highest $FEV_1$ measurement to evaluate an individual's respiratory disorders. *Id*. If spirometry results show an $FEV_1$ score that is less than 70% of the individual's predicted normal value, the agency requires repeat spirometry after inhalation of a bronchodilator to evaluate the respiratory disorder, unless it is medically contraindicated. *Id*. § 3.00(E)(2)(b).

The ALJ found that Plaintiff's impairments did not meet or medically equal the criteria of Listing 3.02 because there was no evidence of $FEV_1$ values equal to or less than 1.90. (R. at 14); *see* 20 C.F.R. Pt. 404, Supt. P, App. 1, § 3.02. Mr. Starrett challenges this conclusion on three grounds.

To begin with, Mr. Starrett questions why the agency requires both an $FEV_1$ score below 1.90 and spirometry results at 70% of predicted normal value, and "why the agency is so willing to disregard a valid test just because bronchodilation was not administered" (Pl.'s Br., DE 16 at 10.) But insofar as Mr. Starrett is challenging the regulations, his argument is cursory, undeveloped, and unsupported by any authority. So his argument is waived. *United States v. Foster*, 652 F.3d 776, 792 (7th Cir. 2011) ("As we have said numerous times, undeveloped arguments are deemed waived.") (quoting *United States v. Collins*, 604 F.3d 481, 488 (7th Cir.

2010)). In any case, "42 U.S.C. § 405(a) grants the Secretary full power and authority to promulgate rules and regulations which are necessary and appropriate to carry out the provisions of the Act. It is well established, of course, that we must uphold such regulations if they are 'reasonably related' to the purposes of the enabling legislation." *Cheers v. Sec'y of Health, Educ. & Welfare*, 610 F.2d 463, 466 (7th Cir. 1979). Nothing in Mr. Starrett's brief even remotely suggests that Listing 3.02 is not reasonably related to the purposes of administering the Social Security Act.

The Social Security Administration "explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard." *Sullivan v. Zebley*, 493 U.S. 521, 533 (1990). This means that an individual whose impairments meet or medically equal a listing has impairments severe enough to prevent them from doing "*any* gainful activity, not just 'substantial gainful activity.'" *Id*. (emphasis in original) (citing 20 C.F.R. § 416.925(a)). "The Listing of Impairments was developed by the Social Security Administration (with the aid of its Medical Advisory Committee) when the disability program began. The Listing, which is continuously reviewed and updated on program experience and medical advances, describes the most frequently disabling impairments in terms of signs, symptoms, and laboratory findings that reflect the level that would prevent most people so impaired from working for a year or longer." *See* History of SSA During the Johnson Administration 1963–1968, https://perma.cc/2JEK-6A5U (last visited February 10, 2025). Indeed, the respiratory listings at issue were updated in 2016. *See* Revised Medical Criteria for Evaluating Respiratory System Disorders, https://perma.cc/5U9U-M6ZA (last visited February 10, 2025). As a result, the Court sees no reason to disturb this Listing.

Next, Mr. Starrett suggests that his pulmonary function tests produced $FEV_1$ values that fell below 3.02 Listing's benchmark. But this argument is misplaced. In fact, no valid test established Mr. Starrett's $FEV_1$ value at or below 1.90. While Mr. Starrett points to a test in July 2021 when the $FEV_1$ value measured 1.64, he acknowledges that no bronchodilator was administered even though his pre-bronchodilator results were only 39% of his predicted normal value. (Pl.'s Br., DE 16 at 9, 10; R. at 14, 747); *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.00(E)(2)(b) (if $FEV_1$ results are less than 70% of an individual's predicted normal value, "we require repeat spirometry after inhalation of a bronchodilator"). Mr. Starrett also proposes the test values from April 2022, when his worst pre-bronchodilator $FEV_1$ value was 1.61. However, after he was administered a bronchodilator, his $FEV_1$ value rose to 2.03, higher than the Listing's threshold. (Pl.'s Br., DE 16 at 9–10; R. at 916). Accordingly, Mr. Starrett has failed to show that his impairments meet a listing. *See Dzafic*, No. 22-2090, 2023 U.S. App. LEXIS 6292, at *10–11 ("To meet a listing, a claimant must show that she has satisfied, or can be expected to satisfy, the listing's criteria for at least twelve months." (citing 20 C.F.R. § 416.925(c)(4)).

Finally, Mr. Starrett argues that, regardless of whether the $FEV_1$ values met the Listing, the ALJ should have obtained a medical expert's opinion to determine whether his impairments were medically equivalent to Listing 3.02. "An ALJ is only required to seek an expert opinion on equivalency, however, when she believes the evidence reasonably supports a finding that the impairment medically equals a listing." *Dzafic*, No. 22-2090, 2023 U.S. App. LEXIS 6292, at *12 (citing *Wilder*, 22 F.4th at 653). But as explained in her RFC discussion, the ALJ found that Mr. Starrett could do light work, which confirms that she did not think that his impairments were equivalent to the Listing. In particular, although recognizing that some examinations showed diminished breath sounds and wheezing (R. at 21, 1280), the ALJ found that by March 2022, he

11

reported greatly reduced use of his inhaler and his respiratory examination was normal (R. at 22, 940-42); his condition improved even more after the catheterization and placement of the stent. The ALJ also relied on the state agency physicians' finding that Mr. Starrett could perform light work, which the ALJ found to be consistent with the evidence in the record. (R. at 24.) In other words, there's no suggestion that the ALJ believed evidence reasonably supports a finding that any of the impairments are equivalent to the Listing. So the ALJ committed no error when she sought no input from a medical expert. *See Dzafic v. Kijakazi*, No. 22-2090, 2023 U.S. App. LEXIS 6292, at *12 ("Here, the ALJ's finding that Dzafic could perform light work, explained in the RFC analysis, indicates that she did not believe Dzafic's impairment equaled the criteria for presumptive disability under the listings. Thus, she was not required to seek an expert opinion on the matter, nor was she not required to separately discuss equivalence.") (citing *Deloney v. Saul*, 840 Fed. Appx. 1, 4 (7th Cir. 2020)); *see also Wilder*, 22 F.4th at 653 (7th Cir. 2022) ("According to Social Security Ruling 17-2p, 'If an [ALJ] believes that the evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, *we do not require the adjudicator to obtain [medical expert] evidence* or medical support staff input prior to making a step 3 finding that the individual's impairment(s) does not medically equal a listed impairment.' 2017 SSR LEXIS 2, *10, 2017 WL 3928306, at *4 (emphasis added). Rather, ALJs '*may* ask for and consider evidence from medical experts . . . about the individual's impairment(s), such as the nature and severity of the impairment(s).' [**19] 2017 SSR LEXIS 2, *6, [WL] at *3 (emphasis added).") Simply put, Mr. Starrett has failed to meet his burden to show that his impairments satisfy all the requirements of Listing 3.02. *See Pattee v. Kijakazi*, No. 22-2975, 2023 U.S. App. LEXIS 31669, at *10 (7th Cir. Nov. 30, 2023) ("As the claimant, however, [the plaintiff] had the burden of showing that his

impairments satisfied the listing's criteria."). For all these reasons, the Court sees no basis for reversing the Commissioner's ruling concerning Listing 3.02.

The Court reaches the same conclusion about Mr. Starrett's challenge to the ALJ finding that his impairments do not meet Listing 4.02. Listing 4.02 contains a twofold requirement. First, it requires the "medically documented presences" of either systolic or diastolic failure with specified markers, "while on a regimen of prescribed treatment." 20 C.F.R. Pt. 404, Supt. P, App. 1, § 4.02. If this requirement is satisfied, the plaintiff then must show that the systolic or diastolic failure resulted in "[p]ersistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living," or "[t]hree or more separate episodes of acute congestive heart failure within a consecutive 12-month period," or—as relevant here—"[i]nability to perform on an exercise tolerance test at a workload equivalent to 5 METs[6] or less due to . . . [d]yspnea, fatigue, palpitations, or chest discomfort . . . ." *Id.*

The ALJ found that Mr. Starrett's impairments did not meet both requirements. (R. at 14.) Mr. Starrett does not argue that the ALJ failed to make the required listing analysis, so any such argument is waived. *See Richison v. Astrue*, 462 F. App'x 622, 626 (7th Cir. 2012) (when a Social Security disability claimant does not develop an argument on appeal, it is waived). Additionally, although it is his burden, Mr. Starrett has provided no evidence that Listing 4.02 has been met. In fact, he admits as much by saying that "not all of the evidence is there to clearly say that Listing 4.02 is met." (Pl.'s Br., DE 16 at 13.) Failing to present such evidence dooms his

---

[6] MET is "a unit of measure of the rate at which the body expends energy that is based on the energy expenditure while sitting at rest and is equal to 3.5 milliliters of oxygen per kilogram of body weight per minute"; "called also metabolic equivalent." Merriam-Webster Medical Dictionary, https://perma.cc/K6M9-WX48 (last visited February 10, 2025).

challenge to the ALJ's finding. *See Knox v. Astrue*, 327 F. App'x 652, 655 (7th Cir. 2009) ("Although an ALJ should provide a step-three analysis, a claimant first has the burden to present medical findings that match or equal in severity all the criteria specified by a listing.") (citing *Zebley*, 493 U.S. 521, 531); *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) ("[The plaintiff] has the burden of showing that his impairments meet a listing, and he must show that his impairments satisfy all of the various criteria specified in the listing."). Unable to dispute the ALJ's finding that he has failed to meet a listing, he insists that the ALJ should have employed a medical expert to consider medical equivalence. He submits that such expertise would have been especially relevant in light of the evidence of cardiac rehabilitation showing that ninety days after the placement of the stent he was exercising at the average of 3.3 METs. (Pl.'s Br., DE 16 at 14 (citing R. at 1719).)

As explained above, the ALJ was not required to separately discuss equivalence. *See also Deloney v. Saul*, 840 F. App'x 1, 4 (7th Cir. 2020) ("In the step-three discussion, the ALJ also stated that Deloney's impairment did not equal the criteria of § 1.02(A) without elaborating or citing evidence relevant to impairments of possibly equivalent significance—but he did not have to separately discuss equivalence.") (citing Social Security Ruling (SSR) 17-2p, 82 Fed. Reg. 15,263, 15,265 (Mar. 27, 2017)). As of March 27, 2017, the ALJ need not articulate specific evidence when she believes the record does not reasonably support a finding that the claimant's impairments equal a Listing:

> If an adjudicator at the hearings or AC level believes that the evidence already received in the record does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, the adjudicator is not required to articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment. Generally, a statement that the individual's impairment(s) does not medically equal a listed impairment constitutes sufficient articulation for this finding. An adjudicator's articulation of the reason(s) why the individual is or is not disabled at a later step in the sequential

14

> evaluation process will provide rationale that is sufficient for a subsequent reviewer or court to determine the basis for the finding about medical equivalence at step 3.

Soc. Sec. Ruling (SSR) 17-2p. (Mar. 27, 2017); *see also Zieroth v. Saul*, No. 1:19CV181, 2020 WL 3490235, at *3 (N.D. Ind. May 29, 2020) ("while ALJs must rely on experts to interpret medical evidence, they are not necessarily required to obtain a medical opinion specifically as to whether a claimant meets or equals a listing"). In any case, the ALJ explained in the remainder of her decision why Mr. Starrett's impairments were not as debilitating as alleged: respiratory examinations generally were normal; his breathing was managed with medication and rescue inhaler, with no exacerbations since May 2021; at the consultative psychological examination he denied any trouble walking; and after left heart catheterization and additional stent placement, he denied any further cardiac issues. (R. at 22, 23, 919, 1650–51, 1658–61.) Because these findings are based on substantial evidence, the Court finds no error in the ALJ's conclusion that Mr. Starrett's impairments do not meet or equal Listing 4.02.

One final note: Mr. Starrett believes that the cardiac rehabilitation records constitute new evidence that should have been reviewed by an expert. But apart from claiming summarily that this evidence was complex, Mr. Starrett has not shown that "the new information changed the picture so much that the ALJ erred to rely on outdated assessment by a non-examining physician and by evaluating himself the significance of the [the subsequent] report." *Kemplen v. Saul*, 844 F. App'x 883, 887 (7th Cir. 2021) (quotation marks and citation omitted). Nor has he shown that the ALJ interpreted medical evidence on his own so as to play a doctor. Rather, as her decision shows, the ALJ considered various medical reports—as opposed to raw data—and used that information to reach her conclusions. Simply put, Mr. Starrett has shown no error.

**(2) *Dr. Gering's Opinion***

Dr. Gering is a cardiologist who saw Mr. Starrett once, on August 3, 2021. Two days later, he filled out an FMLA form on behalf of Mr. Starrett. Dr. Gering opined that Mr. Starrett's coronary artery disease and supraventricular tachycardia are lifelong impairments that "could interfere with [his] job functions," making him absent from work for one to three days once or twice a month. (R. at 337–40.) According to Dr. Gering, Mr. Starrett required only "yearly office visits" due to his condition. (R. at 340.) The ALJ found this opinion unpersuasive. Mr. Starrett contends that the ALJ erred by failing to explain why he found Dr. Gering's medical opinion unsupported and inconsistent with the evidence from other medical sources.

An ALJ "must explain 'how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [a claimant's] case records." *Willis v. Acting Comm'r of Soc. Sec.*, 2022 WL 2384031, *3 (N.D. Ind. June 30, 2022) (quoting 20 C.F.R. § 404.1520c(b)). "In weighing the persuasiveness of a medical opinion, the 'most important factors' an ALJ considers are the opinion's 'supportability' and 'consistency' with the record. *Desotelle v. Kijakazi*, No. 22-1602, 2023 U.S. App. LEXIS 15777, at *4 (7th Cir. June 23, 2023) (quoting 20 C.F.R. § 404.1520c(b)(2)). Supportability is a concept which refers to the degree to which an opinion is supported by the examiner's own objective medical evidence and explanation. 20 C.F.R. § 404.1520c(c)(1). Consistency refers to the degree to which the opinion is consistent with other evidence from the record including medical and non-medical sources. 20 C.F.R. § 404.1520c(c)(2). An ALJ needs only 'minimally articulate[]' her reasoning for the persuasiveness of the medical opinion. *Desotelle*, 2023 U.S. App. LEXIS 15777, at *4 (quoting *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008)). At the same time, "[t]he ultimate question is whether the ALJ's decision is sufficiently specific to facilitate meaningful review." *Fischer v. Barnhart*, 129 F. App'x 297, 303 (7th Cir. 2005).

The ALJ sufficiently articulated her reasoning regarding supportability and consistency of Dr. Gering's opinion, allowing the Court a meaningful review. And having conducted such a review, the Court finds her decision discounting Dr. Gering's opinion is based on substantial evidence. The ALJ found Dr. Gering's opinion unpersuasive because it lacked a clear explanation for the limitations it suggested and was unsupported by the overall medical record. Mr. Starrett saw Dr. Gering once for coronary artery disease. His cardiovascular examination at that time was unremarkable, and Dr. Gering recommended that he return in about a year (R. at 21, 24, 1276–77, 1280). In summarizing this visit, the ALJ noted that Mr. Starrett had recently been seen at the hospital and "acute coronary syndrome was ruled out." (R. at 21, 1277.) On the FMLA form, Dr. Gering opined that "flare ups could cause leg pain, chest pain, or palpitations that could interfere with Patient's job function." According to Dr. Gering, this condition started in March 2020 and would last for a lifetime. Without Dr. Gering explaining his rather conclusory statements or referring to medical history that supports his opinions, the ALJ's assessment that the opinion lacked sufficient explanation to be persuasive is not contrary to law. Nor is the ALJ's belief that such an opinion is contradicted by the overall record problematic, especially beginning in September 2022, when Mr. Starrett received a stent placement. After all, the medical records, which the ALJ summarized in discussing the RFC assessment, do show stability in Mr. Starrett's condition, except for the time when he needed a stent. (R. at 24, 1649–51, 1658–89.) While the records demonstrate that Mr. Starrett presented himself somewhat regularly with chest discomfort, his examinations were largely normal, his pacemaker had no or minimal events; and notes from several visits state that he was cleared to return to work. (R. at 20–24.) Relying on the medical records, the ALJ summarized his cardiac issues as follows:

> The record shows the claimant has a history of cardiac issues with pacemaker and atrial fibrillation, which were treated with warfarin. He was able to return to work

> following the cardiac placement and the cardiac records, discussed below, show he was generally stable with medication without any exacerbations until approximately September 2022 when he required left heart catheterization and additional stent placement. However, the post operative cardiac notes show he had improvement following this procedure and by October 2022, he denied any further cardiac issues.

(R. at 23.) In other words, the ALJ's finding that Dr. Gering's opinion is unsupported and inconsistent with the medical record is based on substantial evidence, and Mr. Starrett's insistence to overrule the ALJ is a veiled request to reweigh the evidence. *Stover v. Kijakazi*, No. 2:22-CV-38-RLM, 2023 WL 2300515, at *3 (N.D. Ind. Mar. 1, 2023) ("The ALJ's opinion supported his finding that Dr. Carter's medical opinion wasn't persuasive because it conflicted with the other medical evidence provided in the record. That's enough under 20 C.F.R. § 404.1520c.").

Finally, Mr. Starrett argues that the ALJ erred in treating Dr. Gering's opinion as lacking "durational assessment." (R. at 24.) He points out that Dr. Gering opined that Mr. Starrett impairments were expected to last a lifetime. But he ignores that Dr. Gering filled out an FMLA form in support of Mr. Starrett seeking relief under the statute, which is temporary in nature. Because the Court looks for assurance that the ALJ based his decision on substantial evidence, there are no legitimate grounds to disturb the ALJ's conclusion about the scope of Dr. Gering's opinion. But in any case, the ALJ did not rely solely on this point in making his decision. Therefore, even if the Court were to find that the ALJ erred in interpreting Dr. Gering's opinion about the duration of his impairment, the other grounds for his findings remain intact. *See Stanfill v. Berryhill*, No. 3:17-CV-856-PPS, 2019 WL 1198952, at *4 (N.D. Ind. Mar. 13, 2019) (noting that the plaintiff "does not point out any uncontroverted evidence at odds with the ALJ's decision . . . [i]nstead [the plaintiff] wants me to second-guess the ALJ and re-weigh the

evidence in a manner that would result in a more limited RFC determination . . . [b]ut that is not something a reviewing court is permitted to do").

### E. Conclusion

For these reasons, the Court AFFIRMS the Commissioner's decision. The Clerk is directed to prepare a judgment for the Court's approval.

SO ORDERED.

ENTERED: February 10, 2025

                                         /s/ JON E. DEGUILIO  
                                         Judge  
                                           United States District Court